SOPHENA KARABATSOS *et al.*, Plaintiffs-Appellees, *v.* SPIVEY COMPANY, Defendant-Appellant.

First District (4th Division)    No. 61976

Opinion filed May 19, 1977.

318

Kirkland & Ellis, of Chicago (Francis B. Libbe, Gary M. Elden, and Barbara B. Lounsbury, of counsel), for appellant.

Cooney & Stenn, of Chicago (Robert J. Cooney and John E. Navigato, of counsel), for appellees.

Mr. JUSTICE ROMITI delivered the opinion of the court:

This is an appeal from a judgment for the plaintiff in a products liability case. The defendant-installer appeals arguing that as a matter of law the plaintiff assumed the risk, and, that because of certain alteration in the product, the installer could not be held liable because of an initial failure to install certain safety devices. We hold that under the facts and issues presented the trial court properly submitted the case to the jury, and affirm.

On June 26, 1970, at 3 a.m. the principal plaintiff Karabatsos (hereinafter referred to as plaintiff) was ending his work for the day with United Parcel. He was an attendant on a conveyor belt and was charged with lifting boxes as they were diverted off a conveyor belt by a diverter and placing them on a top conveyor belt. A package popped over the diverter and rolled on the belt towards certain rollers or cylinders eight to ten feet away. Karabatsos moved to his left and reached for the package when it was two feet from these rollers. He slipped on some water on the catwalk he was on (caused by the fact that men drank water from a water fountain installed immediately nearby and spat on the catwalk) and fell onto the belt. His right arm was pulled into the cylinders although he managed to save himself by clinging to a post. His right arm was ripped

off. Karabatsos and his wife brought this suit against the defendant Spivey who installed the conveyor in 1963, alleging that his injury was caused by the fact that no screens were placed on the machine. The jury awarded Karabatsos $200,000 and his wife $10,000. In answer to a special interrogatory, the jury found that the plaintiff did not assume the risk.

The evidence in the case is fairly clear as to the set-up of the conveyors at the time of the accident. The conveyor belt in question (called Dock A) had two levels which moved in opposite directions. The bottom level was approximately three feet above the floor and the top level was approximately four feet above the bottom level. The steel catwalk was at about the same level as the bottom belt. The top level of the belt carried packages up an incline for approximately eight to ten feet (this was the area above the rollers and the diverter) and then straightened out, carrying them level for the rest of the way along the belt. It was in this latter area that the upper belt was four feet higher than the lower. At times packages would fall from the top to the lower belt. These were then carried back in the opposite direction. Eight to ten feet before these packages would reach the terminal end of the belt, they were knocked off the belt and onto the catwalk by the diverter, a flat piece of metal that spanned the width of the belt. Unfortunately, at the time of the accident the diverter was only three inches high and many packages would jump over the diverter. At the terminal end of the belt (eight to ten feet from the diverter), sandwiched between the upper and lower levels at the point where these levels are closest together, were two cylindrical metal rods or rollers. One of the two rollers rested on the bottom belt, the other was directly above it. There were also some stop-start buttons (not installed by Spivey) mounted next to and slightly above the diverter.

It was the function of the bottom belt attendant to put these packages which were kicked onto the catwalk onto the top belt. It appears that, at the time of the accident, since, obviously, any package caught in the rollers would be badly damaged, it had become the practice to try to reach packages which jumped over the diverter before they were caught in the rollers. One of the plaintiff's witnesses, Maras, acknowledged that he tried to get the packages "all times" and that he had been hurt. Another, Pearson, testified that he had done it on occasion but it was very dangerous. The evidence was conflicting as to whether the plaintiff had been told not to go for the packages unless he turned the belt off, or whether he knew how to turn the belt off. He testified that he did not know how, and that no one had told them not to put their hands near the conveyor while it was on but "we knew it was dangerous" because he had seen the supervisor many times take packages which had been caught in the belt.

After the accident the 3″ diverter was replaced by a 12″ diverter. Also a

screen was placed across the area. This screen did not go across the belt parallel to the rollers. Rather, it was on the side of the belt, at right angles to the rollers, extending from the rollers to close to the diverter and from the upper to the lower belt. It would appear that the obvious purpose of the screen is to prevent anyone from putting their hands on the belt at that point. Also the water fountain was moved and rubber put on the catwalk.

The various conveyors were installed by Spivey. Apparently some were made by Spivey and some by other manufacturers. United Parcel, not Spivey, designed the conveyors. The various components were put together and installed on the premises. There were no screens shown on the working plans because the plans were not intended to show such matters. It was Spivey's normal practice to install screens; when that was done most of the screens were fabricated on the job site to suit the particular conditions. However, on this job, it was not Tom Green's, Spivey's foreman for the job, position to determine whether screens should be installed. There was no evidence at all as to whether Spivey or United Parcel made that determination. Also, since Tom Green died before the accident, no one knew whether a screen was made for the particular terminal. There was evidence, however, that once the conveyor belt was in operation there was no screen at that spot on it until after the accident.

O'Malley, who moved the dock in 1967, testified on direct examination that he made no changes on it other than to move it seven to twelve feet forward so that a secondary conveyor system could be moved behind it. However, on cross-examination he admitted he had added a chute, and that he did not remember whether the rollers had been changed or not. He also did not know if any changes had been made in 1964 and 1965. The plaintiff introduced no other evidence showing that the conveyor at the time of the accident was in the same condition it was in at the time it left the defendant's control. On the other hand, there was some evidence, including installation drawings, showing that when the conveyor was first installed, the lower belt was 2' 10" high and the upper belt was 5' 4" high (*i.e.*, there was 2½ feet between the two belts); the upper belt was level throughout; two of the three rollers rested just beneath the top belt, several feet apart, and both of these were well behind the single roller which rested on the lower belt so it would appear that it would have been impossible for anything to go in between the rollers, and the diverter was a little over 12" high, with a rubber strip on the bottom so that nothing could go over or under.

The American Safety Code provides that:

> "Safety guards shall be provided on the types of equipment at driving mechanisms, terminals and take-ups where the unguarded parts may constitute a hazard to the operating personnel."

John Andrews, who testified as an expert witness for the plaintiff, stated he considered the area behind the diverter to be a work area because packages can go over the diverter and that he did not think that it would be possible packages would never get over despite the diverter. However, one of the employees testifying for the plaintiff testified "[The former screen is] not too high, you know. Short, you know. After put this one, the big one, the package come out." And the president of Spivey, called as a section 60 witness, testified that the conveyor did comply with the standards since that was not a place where operating personnel would normally be working. The only place where packages could be taken off the belt was where the diverter knocks them off the belt and no one reaches under there to take a package off.

The only issues raised by the parties on appeal are whether as a matter of law the plaintiff assumed the risk, and whether, because of certain alleged alterations, the defendant cannot be held responsible for the injury. Accordingly, such questions as whether the product was "unreasonably dangerous" under the Restatement of Torts, section 402A, and prevailing Illinois law; whether the plaintiff met his burden of proving that the product was unreasonably dangerous when it left the manufacturer and whether the defendant can be held responsible for the absence of screens when the construction of the conveyor was under the direction of the employer which drew the original blueprints are not before us for consideration.

## I.

■■■ While contributory negligence is not a defense in a products liability action, assumption of risk is. (*Williams v. Brown Manufacturing Co., Inc.* (1970), 45 Ill. 2d 418, 261 N.E.2d 305.) Thus, where it is clear that the plaintiff had actual knowledge of the danger, that he understood and appreciated the risk, and that he deliberately exposed himself to such risk all while he was of full age, well experienced, with complete knowledge and understanding of an obvious danger, the plaintiff cannot recover. (*Fore v. Vermeer Manufacturing Co.* (1972), 7 Ill. App. 3d 346, 287 N.E.2d 526, and see *Denton v. Bachtold Brothers, Inc.* (1972), 8 Ill. App. 3d 1038, 291 N.E.2d 229, *appeal denied*, 53 Ill. 2d 607.) Nevertheless, assumption of risk is an affirmative defense. The burden of proof therefore is on the defendant and the courts are reluctant to direct a verdict for the party having the burden of proof.

■■ In the instant case, the jury, in answer to a special interrogatory, found that the defendant had failed to carry its burden of proving that the plaintiff had assumed the risk of injury. We cannot say that this conclusion was in error. We are aware that the courts in *Fore v. Vermeer Manufacturing Co.* (1972), 7 Ill. App. 3d 346, 287 N.E.2d 526, and

*Ralston v. Illinois Power Co.* (1973), 13 Ill. App. 3d 95, 299 N.E.2d 497, both ruled that where the plaintiff admitted that he knew the act was dangerous, the court was required to find an assumption of risk as a matter of law. But in both of those cases the evidence was much clearer that at the time of the accident the plaintiff was well aware of the danger and, indeed, had made many complaints to his employer about the danger.

In considering the evidence in the case at bar, the jury could have concluded that while Karabatsos was aware he would be hurt if his hands were caught in the rollers, he was not aware that he could be injured if he reached for a package several feet away from the rollers, and we cannot reverse merely because we might have made a contrary finding had we been the trier of fact. *Haberer v. Moorman Manufacturing Co.* (1950), 341 Ill. App. 521, 94 N.E.2d 611.

Nor do we find that *Denton v. Bachtold Bros.* (1972), 8 Ill. App. 3d 1038, 291 N.E.2d 229, *appeal denied*, 53 Ill. 2d 607, is controlling, as the defendant argues. In that case the defendant was aware he could stop the mower before stepping to its side to move a barrel in its path but did not do so. As a result, when he slipped and fell his feet came into contact with the rotating blades. In the present case the jury could well have found that the plaintiff did not know which button to push to stop the conveyor and could not have had, given the emergency situation, time to find out.

## II.

As already pointed out, the only other issue before the court, as limited by the appellant's brief and oral argument, is whether there were such alterations of the product that any absence of screens in 1963 could not be considered to be a cause of the accident. Specifically, three alterations are mentioned:

> (A) the replacement of the 12″ diverter with the 3″ diverter;
> (B) the change in the height between the belts and the change in the shape of the opening from rectangular to trapezoidal;
> (C) the placing of the catwalk next to a water fountain.

## (A)

■■ The evidence is clear that the employer did change the diverter. But the evidence is conflicting as to whether a 12″ diverter would have prevented packages from jumping over the diverter and going into the rollers. While one of United Parcel's employees testified that since the larger diverter had been installed the packages did not jump over the diverter but came out, John Andrews, the plaintiff's expert witness, testified that no diverter could prevent all packages from jumping over it. Accordingly, it was for the jury to determine whether, in the absence of this alteration, the accident could have occurred.

## (B)

■■ The defendant argues that any safety guard installed in 1963 would have been useless after the alteration of the opening because it would not have provided adequate protection. But there is no proof that it would not have done so. Furthermore, the evidence is not clear whether in fact the opening was altered. It is true that the drawings indicated the space between the belts in 1963 was only 2½ feet and that the belts were parallel throughout, but no one really knew, and the evidence therefore merely speculated, whether the drawings were in fact followed. Accordingly, the jury could reasonably have concluded that the evidence did not support the contention that any screens installed in 1963 would have been useless in 1970.

## (C)

■■■ Finally, the defendant contends that it cannot be held liable since the conveyor in 1967 was moved next to a water fountain. But in fact there is no evidence in the record showing there was no water fountain near the belt before 1967. There well may have been. In any event, the presence of a water fountain is not the type of alteration which could absolve the defendant of all responsibility for its product. The defendant must anticipate the normal and foreseeable uses which may occur. Moreover, the fact that another party may have acted to make the product more unsafe is no defense so long as the unsafe condition attributed to the manufacturer, and which existed when the product left the manufacturer, is the proximate cause of the plaintiff's injury. *Kuziw v. Lake Engineering Co.* (N.D. Ill. 1975), 398 F. Supp. 961.

■■ To summarize, therefore, we find that the evidence was in conflict on the issues raised by the defendant. It is the function of the jury, not this court, to resolve these conflicts (*Mayberry v. Cage* (1944), 322 Ill. App. 655, 54 N.E.2d 619; *Pfister v. West* (1964), 53 Ill. App. 2d 305, 203 N.E.2d 35), and this court will not disturb the jury finding when the evidence is nearly balanced or even where the verdict may appear to be against the weight of the evidence. 2 Ill. L. & Prac. *Appeal & Error* §778 (1953).

For the foregoing reasons the judgment of the trial court is affirmed.

Affirmed.

JOHNSON and LINN, JJ., concur.