William KUZIW, Plaintiff,

v.

LAKE ENGINEERING COMPANY, Division of Arlo Manufacturing Corporation, a corporation, Fluid Power, Division of Sta-Rite Industries, Inc., a corporation, and Economy Baler Corporation, a corporation, Defendants.

No. 71 C 253.

United States District Court,
N. D. Illinois, E. D.

Oct. 19, 1977.

Alan E. Morrill and Morrill, Koutsky, Chuhak & Upton, Chicago, Ill., for plaintiff.

George E. Sweeney and Kralovec, Sweeney, Marquard & Doyle, Chicago, Ill., for defendants Lake Engineering Company and Economy Baler Corporation, and Jack L. Watson and Schaffenegger & Watson, Chicago, Ill., for defendant Fluid Power.

## MEMORANDUM OF DECISION

PERRY, Senior District Judge.

This cause comes before the court on certain post-trial motions of defendant Fluid Power, a Division of Sta-Rite Industries, Inc., a corporation (hereinafter "Fluid Power") and certain consolidated post-trial motions of defendants Lake Engineering Company (hereinafter "Lake") and Economy Baler Corporation (hereinafter "Economy").

The plaintiff William Kuziw in his complaint sought redress for personal injuries sustained by him while he was operating a certain baling machine manufactured by defendant Lake and purchased by plaintiff's employers from defendant Economy for use in the Garland Building in Chicago, Illinois. Plaintiff alleged in his complaint that the baling machine and its component parts were unreasonably dangerous, that this unreasonably-dangerous condition existed at the time the baling machine left the control of the defendants, that the condition was due to a defect in design or manufacture of an hydraulic control valve, which was a component of the baling machine, and that this defect was the proximate cause of his injuries. The hydraulic control valve was designed and manufactured by defendant Fluid Power. Kuziw sought one million dollars in damages, plus costs of maintaining the action, from all defendants. In their answers to the complaint, defendants denied that either the baling machine or the hydraulic control valve component thereof was unreasonably dangerous when the machine left the control of defendants. Defendants further denied that the plaintiff was injured because of design or manufacturing defects in the machine or its component parts, including the hydraulic control valve. The complaint thus sounds in strict liability in tort.

The case was tried to a jury, and the plaintiff was awarded a verdict of $95,000 from all defendants. At the trial it was established that plaintiff's injury occurred when he inserted his right arm into the top of the machine in order to untangle baling twine which had become entangled with a

piece of cardboard paper. Three spools of baling twine were located at the bottom of the operator's end of the machine, and three lines of twine were led underneath the length of the machine to the baling section, which was located at the opposite end of the machine. Plaintiff's arm was inserted into the machine at a point between the ram and a cross-member located on the frame of the machine. While his arm was thus positioned, a defective hydraulic control valve caused the ram slowly to recede (to "creep") unbeknownst to the plaintiff until his arm became crushed between the receding ram and the cross-member of the frame. It was uncontroverted that the valve was defective at the time of the injury.

It was also uncontroverted that at the time the machine was manufactured, sold and delivered to the Garland Building, the machine was equipped with a ⅛-inch-thick steel plate bolted with ten screws over the top of the ram portion of the machine. The purpose of this plate was to serve as a safety device in eliminating "pinch-points", and to prevent substances from falling into the rear of the machine. The evidence established that at some unascertainable time during the year in which the machine was in use at the Garland Building prior to plaintiff's accident, this steel safety plate had been removed by some person or persons unknown. Uncontroverted evidence established that, had the steel safety plate been in place,—as it was when the machine was delivered to the Garland Building,— plaintiff's injury would not have occurred. To this fact, which is deemed crucial to the determination of liability in this case, plaintiff's attorney even stipulated. On July 19th the jury returned a verdict in favor of plaintiff and against all defendants on the issue of liability. On July 21st the court took under advisement defendants' motion for a hearing instanter on their motions for a directed verdict, for judgment in their favor and against the plaintiff, or, alternatively, for a new trial, for rulings on the aforesaid motions prior to jury consideration of damages, and for a 10-day extension within which to file statements of fact and supporting memoranda of law. The trial then proceeded on the issue of damages, and on July 25th the jury returned a verdict for the plaintiff and against all defendants for damages in the sum of $95,000. The court then set a briefing schedule for post-trial motions.

Defendant Fluid Power on July 25th filed a motion for judgment in its favor on the issues of liability and damages notwithstanding the verdicts, or, alternatively, for a new trial on said issues notwithstanding the verdicts. Fluid Power simultaneously filed a multi-fold motion as follows: (1) for a ruling on its motions for directed verdict at the close of plaintiff's case and at the close of all the evidence; (2) for judgment in its favor notwithstanding the verdict returned on the issue of liability; (3) for a new trial on the issue of liability; (4) for the setting of a briefing schedule and a schedule for oral arguments on the aforesaid motions; and (5) for a stay of all proceedings for 10 days until disposition was made of the foregoing motions.

Also on July 25th, defendants Lake and Economy filed the following consolidated motion: (1) for an order reversing the verdict of the jury with regard to liability against defendants Lake and Economy; (2) for an order entering judgment, notwithstanding the verdict of the jury, in favor of said defendants; (3) for an order vacating the verdict of the jury with regard to the amount of verdict and to enter a verdict of no damages in favor of said defendants and against the plaintiff; (4) in the alternative, for an order granting the motion of said defendants for a directed verdict at the conclusion of all of the evidence adduced in chief by the plaintiff, or, in the alternative, for an order directing the jury to find in favor of said defendants at the conclusion of all of the evidence; and (5) in the alternative, for an order granting a new trial on the issues of damages and liability.

On August 8th defendant Fluid Power filed an Amended Post-Trial Motion for judgment in its favor notwithstanding the verdicts returned in favor of the plaintiff, or, in the alternative, for a new trial on all issues.

The foregoing post-trial motions became fully briefed on September 28th. For reasons set forth below, this court must set aside the aforesaid verdicts of the jury.

## I.

The court concludes that the overwhelming weight of the evidence proved that a machine, reasonably safe when it was manufactured and delivered by defendants to plaintiff's employers, was thereafter transformed into a dangerous machine by the removal of the steel safety plate by some unknown person subsequent to the delivery of the machine to the Garland Building and prior to the occurrence of plaintiff's injury.

Strict liability in tort is predicated upon a determination that there existed an unreasonably-dangerous condition of the product at the time it left the manufacturer's control, and that such condition was the proximate cause of the plaintiff's injury. *Suvada v. White Motor Co.,* 32 Ill.2d 612, 623, 210 N.E.2d 182 (1965). The manufacturer may allege, however, that an intervening act of another party was the proximate cause of the injury, and proof of such allegation will constitute a complete defense to the action. *Kuziw v. Lake Engineering Co.,* 398 F.Supp. 961, 963 (N.D.Ill. 1975). In the instant case, the evidence overwhelmingly proved that the removal of the steel safety plate was such an intervening act.

There was no evidence to show that it was necessary to remove the steel safety plate, and there was no evidence to show how, or why, or when it was removed. Even assuming that someone in the Garland Building had deemed it necessary to remove the plate upon occasion for the purpose of cleaning the interior of the machine, or the like, there was no evidence whatsoever to show that it would be necessary to leave the safety plate off the machine while the machine was in operation. The evidence also showed that it was at all times easy for an operator to untangle the cords. Hooks were provided by the manufacturer (defendant Lake) for the purpose of reaching the cords, which ran free lengthwise under the body of the baling machine in an open space almost a foot in height between the underbody of the machine and the floor upon which the machine rested upon rollers.

Plaintiff's argument that the machine was unsafe prior to delivery because the hopper door was not equipped wth an interlock device,—as it is now so equipped,—misses the mark simply for the reason that there was absolutely no evidence that the absence of such interlock device was the proximate cause of plaintiff's injury. Plaintiff's numerous additional allegations charging the pre-delivery existence of unreasonably-dangerous conditions in the machine and its component parts (First Amended Complaint At Law, paragraph 5) are similarly irrelevant, again for the crucial reason that plaintiff's injury would never have occurred if the steel safety plate atop the frame of the machine had not been removed by the intervening act of some unknown person after the machine came to rest in the Garland Building.

Strikingly in point with the instant case is *Cepeda v. Cumberland Engineering Co.,* 138 N.J.Super. 344, 351 A.2d 22 (1976). There the plaintiff lost four fingers while operating a pelletizer. As designed by the defendant manufacturer, the operator was protected by a guard affixed to the machine by four bolts. Prior to plaintiff's accident, the guard had been removed. There was no dispute that plaintiff's accident would not have occurred had the guard not been removed. Plaintiff argued, however, that the machine should have been equipped with an interlock, which would have deactivated the machine whenever the guard was removed. The jury returned a verdict in plaintiff's favor in the sum of $125,000. On appeal, the defendant contended that, by placing a fully-effective safety guard on the pelletizer, it had discharged its obligation to provide a machine reasonably safe for the intended use of the machine. The appellate court reversed the trial court's denial of defendant's motion for judgment notwithstanding the verdict, and ordered the entry of judgment in favor of the defendant. Pertinent passages from the appellate court's opinion are as follows:

A manufacturer who designs and sells a piece of equipment which incorporates an adequate safety device cannot as a matter of law be held responsible for the unfortunate results of operating the equipment without the device on the theory that the equipment should have been designed to be inoperable without it, particularly in the absence of evidence that the manufacturer knew or should have known that the equipment would be used contrary to design intentions. *Smith v. Hobart Mfg. Co., supra* [302 F.2d 570 (3 Cir. 1962)]. In the present case there was no such evidence. On the contrary, the undisputed evidence disclosed that the guard served not only a safety function but was equally essential to the efficient and productive use of the equipment. Use of the guard for safety entailed no sacrifice in terms of productivity. Hence, it would have been the extraordinary manufacturer who could have foreseen that an industrial purchaser, presumably concerned with productivity, would remove such an essential part at the sacrifice of both safety and productivity.

Moreover, presence of an interlock on the guard would not have rendered the pelletizer accident-proof. Both experts agreed that the interlock could easily have been rendered inoperative. While it would be senseless to bypass the interlock, it is equally senseless to operate the pelletizer without the guard.

\* \* \* \* \* \*

. . . Although an interlock may be an effective protection against the inadvertent activation of the pelletizer (such as occurred in *Smith*), the accident in this case did not happen that way. Here the pelletizer was intentionally operated over a three-hour period of time without the guard.

\* \* \* \* \* \*

. . . A manufacturer is not an insurer of its product's safety but is required only to refrain from selling a product which is unreasonably dangerous to the user or consumer. *Gossett v. Chrysler Corp.*, 359 F.2d 84 (6 Cir. 1966). Since we hold that the pelletizer, equipped with an admittedly adequate guard, met that standard, on the undisputed facts and as a matter of law expert testimony purporting to require more of the manufacturer becomes irrelevant. *Day v. Barber-Colman Co.*, 10 Ill.App.2d 494, 135 N.E.2d 231, 238 (App.Ct.1956) . . .

## II.

There is still another reason why the verdicts of the jury must be set aside. Plaintiff's principal argument was that a certain component part of the baling machine, *viz.*, the hydraulic control valve manufactured by defendant Fluid Power, was in an unreasonably-dangerous condition when the baling machine was delivered to the Garland Building, and that this condition proximately caused plaintiff's injury by permitting the ram of the machine to recede very slowly (to "creep") without plaintiff's knowledge, and thus to crush his arm at a "pinch point" between the ram head and a cross-member atop the machine after plaintiff had inserted his arm down into the machine for the purpose of freeing an entanglement of a baling twine with a piece of cardboard paper. This argument was based upon the premise that at some time prior to the date of plaintiff's injury, some operator of the machine had applied a force in excess of 132 lbs. to the handle and a washer of the valve, thus causing the washer to become bent ("dished") as a consequence of which the valve itself would thereafter leak whenever the machine was electrically energized; and that such leaking would cause the ram to move almost imperceptibly (to "creep"), even when the valve control handle was in a "neutral" position. The evidence established that whenever the valve handle had returned to a neutral position, the ram was designed to be incapable of moving, either "forward" (in a compressing direction) or "backward" (receding toward the "operator's end" of the machine,—so-called because all of the controls to the machine, both electrical and mechanical, were located at this end of the machine).

Yet there was no evidence whatever that any person had in fact applied such force to the handle of the valve.

Rather, the only evidence that such force had been applied was circumstantial evidence that some outside agency had broken the handle off the valve, and all of the expert witnesses testified that a force capable of shearing the handle could also bend the washer. Moreover, the expert witnesses agreed that such force would constitute an *abnormal* use of the valve. The evidence was equally clear that the only force necessary to move the valve handle was 10 lbs. of *constant* force. There was no evidence that any person had ever yanked the valve handle in a manner which would apply to the valve an *impact* force in excess of 132 lbs. Accordingly, plaintiff's case against Fluid Power was fatally defective because it was bottomed on the premise, *but no evidence,* that some person had applied excessive *impact* force to the valve handle and valve washer during operation of the machine.

Of further significance is the fact that plaintiff's witness, Mr. Davis, put on a courtroom demonstration wherein he grabbed the handle of a Fluid Power specimen valve assembly and, by yanking the handle back and forth as hard as he could, managed to cause the valve washer to become bent; but, by his own admission, Mr. Davis did not apply *constant* force to the valve; rather, he applied an *impact* force in excess of 132 lbs. Thus Mr. Davis proved, not plaintiff's theory, but Fluid Power's theory—namely: (1) it was not possible for a human being to bend the valve washer by manually applying a *constant* force, inasmuch as a human being, according to evidence adduced at the trial, can only apply 50 lbs. of *constant* force, and it took 132 lbs. of force to bend the washer; (2) accordingly, it was necessary that *impact* force in excess of 132 lbs. had to be applied to the handle in order to bend the washer, and the use of such force would constitute an *abnormal* use of the valve; (3) thus, Fluid Power's washer was adequate for any reasonably-foreseeable and necessary use.

Another significant factor relative to Mr. Davis' demonstration and experiments was the fact that he was unable manually to shear the valve handle, either in the courtroom or at his home. From this fact it is eminently reasonable to conclude,—as this court does conclude,—that the force which sheared the valve handle in the Garland Building was not applied directly by any human being, but by some external agent such as a machine, and that the self-same external agency which broke the handle also bent the washer. It surely must be obvious that such an externally-applied force was not a reasonably-foreseeable use of the valve.

By way of defense, three witnesses assisted Fluid Power. George Waterman, called by co-defendant Economy, testified that Economy, beginning in 1960, had used approximately 2000 Fluid Power valves in their baling machines and that plaintiff's complaint was the one and only complaint Economy had ever received concerning a bent washer in a Fluid Power valve. The next witness was Glenn Hubbard. He testified that Fluid Power sold approximately 40,000 valves of this same type and that it had received no complaints whatsoever about the bending or "dishing" of any washers except for plaintiff's complaint. Finally, Russ Henke, an engineer with teaching experience at the University of Wisconsin and the author of several treatises on hydraulic power, testified that Fluid Power's valve, as manufactured, met all recognized standards in the fluid power industry and that in his opinion the valve, as manufactured, was very safe. He testified further that a force which could shear the handle of the valve could also bend the washer. The evidence of these witnesses proved that, of 40,000 such valves manufactured by Fluid Power, only one was known to have ended up with a bent washer. The inference then is inescapable that if the valves had been used in commerce as Mr. Davis used the specimen valve in the courtroom demonstration, defendants would have received more than one complaint in the ten years that Economy had used approximately 2000 such valves in its baling

machines. Moreover, there was absolutely no evidence that any person ever used the valve in the Garland Building in the manner Mr. Davis did in his courtroom demonstration. Thus plaintiff failed to prove that the bent washer was the result of a foreseeable use of the valve.

In summary, the baling machine was delivered to plaintiff's employer in a safe condition, and plaintiff's injury occurred solely as the result of the post-delivery removal of the steel safety plate which had been designed and installed for the purpose of preventing the very kind of pinch-point injury which the plaintiff incurred. Furthermore, thousands of similar hydraulic control valves had been manufactured by Fluid Power and had been installed in similar baling machines which Economy put into the stream of commerce over a ten-year period prior to plaintiff's accident, and not a single complaint concerning these valves had been received until the filing of plaintiff's complaint. There was no evidence whatsoever that there was any defect in or dangerous condition pertaining to the valve, either when the valve was manufactured, or when it was installed in the baling machine, or when the baling machine was delivered to the purchaser at the Garland Building. If the plaintiff were allowed to prevail in this case, the doctrine of strict liability in tort would have to be enlarged to a doctrine of absolute liability,—an enlargement which the courts have persistently rejected.

The court has read *Karabatsos, et al. v. Spivey Co.,* 49 Ill.App.3d 317, 7 Ill.Dec. 158, 364 N.E.2d 319 (1977), a case informally cited by plaintiff's associate counsel on October 7, 1977 (after the briefing schedule had been completed), but is of opinion that the cited case is not authority for altering the decision of this court.

In view of the foregoing, the court must and hereby does grant the motions of all defendants for judgment in their favor and against the plaintiff on the issues of liability and damages, notwithstanding the verdicts of the jury.