Betty A. CAMPBELL, Administrator of
The Estate of Jack E. Willeford,
Deceased, Plaintiff–Appellant,

v.

NORDCO PRODUCTS, A Subsidiary of
Nordskog Company, Inc., and Micro
Switch Company, A Subsidiary of
Honeywell, Inc., Defendants–Appellees.

No. 79–1096.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 10, 1980.

Decided Sept. 3, 1980.

James A. Brandvik, Chicago, Ill., for plaintiff–appellant.

Terrence J. Madden and Thomas H. Fegan, Chicago, Ill., for defendants–appellees.

Before PELL, Circuit Judge, PECK, Senior Circuit Judge,* and WOOD, Circuit Judge.

PELL, Circuit Judge.

Plaintiff–appellant, Betty A. Campbell, Administrator of the estate of Jack E. Willeford, appeals from a final judgment entered on a jury verdict for the defendants in a wrongful death action. Federal jurisdiction is based on diversity of citizenship and the substantive law of Illinois is applicable.

## I.

The accident which caused Willeford's death occurred on May 12, 1974, at O'Hare Airport in Chicago, where the decedent was employed as a lead mechanic for Trans World Airlines (TWA).[1] On the day of the accident, Willeford was notified by the flight engineer of a departing Boeing stretch 727 that a strip of material was hanging from the rear stabilizer of the aircraft. Doubtless motivated by a desire to keep the flight on schedule, he drove immediately to the rear of the aircraft in a lift truck designed and manufactured by defendant Nordco Products (Nordco).

The lift truck is a maintenance vehicle with a hydraulic platform that can be extended up to thirty feet in height through the use of a set of double metal scissors. One of the safety features designed into the truck was a limit switch manufactured by defendant Micro Switch Company, a subsidiary of Honeywell, Inc. (Micro Switch). The purpose of the limit switch was to stop the platform at twelve feet if a set of four outrigger stabilizers had not been extended, because the vehicle, if not stabilized, was considered by Nordco to be unsafe above that height.

The stabilizers could be extended only through the controls at the side of the truck, and it was therefore impossible for a person on the platform to extend them from that position. Consequently the proper procedure in utilizing the lift required any mechanic who needed to work above a height of 12 feet to extend the stabilizers before mounting the platform.[2] The proper procedure, however, was not observed by Willeford for when he arrived below the tail of the aircraft, he immediately jumped on the platform and raised it to a height of approximately twenty–eight feet. The limit switch did not activate to halt the platform at twelve feet, and, as Willeford reached for the offending strip of material on the aircraft, the platform began to sway. He ran back to the controls in an attempt to lower the platform, but the vehicle continued to sway and ultimately fell. Willeford was killed when he jumped from the toppling vehicle and struck his head on the ground.

It was plaintiff's theory that Willeford was in a hurry when he drove to the aircraft, that he forgot to extend the stabilizers, and that the failure of the limit switch to stop the platform at twelve feet resulted from a design defect.

---

* John W. Peck, Senior Circuit Judge of the United States Court of Appeals for the Sixth Circuit, is sitting by designation.

1. A lead mechanic is one who supervises several gates and has up to ten mechanics working under him. Willeford had been hired by TWA in 1953 and had been promoted to lead mechanic in 1971.

2. After Willeford's death, Nordco redesigned the mechanism so that the platform would not operate at any level until the stabilizers had been extended.

Plaintiff alleged that the design of the lift was unreasonably dangerous in one or more of the following respects: the limit switch was improperly installed; the design of the lift was such that the switch could become inoperative under normal working conditions; and an improper type of switch had been selected by the designer of the lift. Additionally, plaintiff contended that the design was unreasonably dangerous in that the outriggers did not extend automatically when the platform was raised, and that Nordco had failed to warn prospective operators that the vehicle could tip over under certain conditions.

Plaintiff's claims against Micro Switch were similar, specifically, that Micro Switch had provided an unreasonably dangerous product in that it had failed to instruct Nordco as to the proper method of installing the switch, or to warn Nordco that improper installation could cause the switch to become inoperative under normal conditions. The jury was instructed on all the above theories.

It was defendants' theory that Willeford knew the switch to be inoperative and assumed the risk in working above the twelve foot level without the stabilizers, that there was no defect in either the design of the lift or the method of installing the switch, and that the switch did not function because it had either intentionally or unintentionally been bent back after the product left Nordco's control.

The limit switch was installed at the rear of the platform and included a roller arm actuator mounted at a forty–five degree angle. As the platform moved upward, the roller shaft moved forward, striking the switch mechanism and causing the opening of a ground circuit through the downward movement of the actuator, thereby cutting the power and causing the platform to stop. Plaintiff contended, however, that the manner in which the switch had been installed caused the roller shaft to contact the mounting bracket on the back of the switch and bend it back to a point where the roller shaft could pass over the switch without the depression of the actuator necessary to break the circuit. There is no dispute that the switch was in fact found to be bent after the accident. Plaintiff's expert witness, Irving Hazard, was of the opinion that the specific cause of the bending was that the size of the screws used in mounting permitted clearance between the switch body and the bracket, thus allowing a slight rotation and bending of the mount with each passage of the bar.[3] In addition, Hazard testified that the safety of the design could have been improved by the selection of a different type of switch.[4]

Defendant's expert witness, Professor Ralph Barnett, disagreed with all of the above assertions. With respect to the method of installation, Professor Barnett testified first that the screws and bolts used to mount the switch were of the proper size and that the calculations of plaintiff's expert witness contained an arithmetical error. He also testified that the switch was mounted in an optimal location, and that it was virtually immovable due to the fact that it had been mounted on a heavy steel bracket and welded into place. He disagreed that the bending of the bracket could have been caused by the passage of the roller bar and was rather of the opinion that the switch had been forced back by some type of lever, e. g., a heavy screwdriver. In support of this opinion, he pointed out the presence of scratch marks on the brass coating of the bracket, and testified

---

**3.** Plaintiff also called as a witness Mike Wozniak, who at the time of the accident was the ground mechanic in charge of the Nordco lift. While Wozniak testified that he had had difficulty in the past with the mounting bracket bending, we note that his testimony indicated that the bracket had been bent *forward*, forcing the actuator down and causing the platform to stop at any level. Wozniak's testimony therefore to some extent contradicts that of Hazard

with respect to the effect of the passing of the roller bar on the bracket.

**4.** In Hazard's opinion, the best switch for the design was one with an actuator arm extending straight upward, which would have been triggered whenever the roller shaft contacted it from either direction, thereby eliminating any risk of a bent bracket putting the actuator out of the contact range of the shaft.

that he had conducted experiments in a laboratory, whereby he had deliberately bent several switches, and had produced scratch marks similar to those on the switch involved in the accident.

Finally, Professor Barnett disagreed that the design of the lift was unreasonably dangerous in that the stabilizers did not extend automatically when the platform was raised. While acknowledging that this design modification was effected by Nordco after the accident that caused Willeford's death, he opined that the original design was preferable from the standpoint of both safety and efficiency. First, the fact that the lift could be operated at heights up to twelve feet without the stabilizers permitted mechanics working at those heights to get closer to their work. Secondly, Professor Barnett noted that with the modified design, the stabilizers extended immediately upon the mechanic's pushing the "Platform Raise" button, which created a risk in that a mechanic not thoroughly trained on the operation of the lift might press the button without being aware that the stabilizers would extend. Because the stabilizers extend with considerable force, this could result in the outriggers either striking someone, or in their contacting an obstruction and pushing the vehicle over.

With respect to plaintiff's claims against Micro Switch, James Null, who had designed the lift for Nordco, testified that even if he had received the instruction and warnings which plaintiff asserts should have been provided with the switch, he would have designed the mechanism in exactly the same manner.

There was considerable testimony and documentary evidence on the final issue of whether Nordco had failed adequately to warn prospective operators of the vehicle that it was unstable under certain conditions. Nordco issued to all purchasers of the lift both an operator's manual and a separate warning sheet which provided as follows:

THE OPERATOR SHOULD UNDERSTAND THAT THE HI–LIFT IS BOTH A STABLE VEHICLE WHEN THE PLATFORM IS FULLY DOWN AND A STABLE WORK PLATFORM WHEN THE HYDRAULIC OUTRIGGERS ARE EXTENDED. HOWEVER, THE HI–LIFT IS NEITHER A STABLE VEHICLE WHEN THE PLATFORM IS RAISED NOR A STABLE WORK PLATFORM WHEN THE PLATFORM IS ELEVATED ABOUT 12 FEET FROM THE GROUND AND THE HYDRAULIC OUTRIGGERS ARE NOT EXTENDED.
ELECTRICAL INTERLOCKS HAVE BEEN BUILT INTO THE HI–LIFT ELECTRICAL SYSTEM TO PREVENT RAISING THE OUTRIGGERS WITH THE PLATFORM RAISED AND TO PREVENT RAISING THE PLATFORM ABOVE 12 FEET UNLESS THE OUTRIGGERS ARE FIRST EXTENDED. DO NOT ATTEMPT TO BYPASS THESE INTERLOCKS BY OVER–RIDING THEM.

This warning, printed in red ink, was sent to TWA five months before the accident in question.

John Cooper, TWA General Manager of Area Maintenance, testified by deposition that the decedent had been checked out in the function of the Nordco lift, so that he, as lead mechanic, could insure that those under his supervision operated the vehicle properly. Richard Gooch, who was the senior ground equipment engineer at the time of the accident, testified that TWA work rules required that the lift be used only with the stabilizers down over a height of twelve feet. Gerald Nelson, a maintenance supervisor for TWA, was called as a witness by the plaintiff, and acknowledged on cross examination that any mechanic who had received the training both he and the decedent had received would know that he was risking serious injury by raising the platform to a height of twenty–eight feet without the outriggers.

After the jury returned a verdict for both defendants, plaintiff filed a motion for a new trial, which was denied. The principal issues raised on appeal are whether the trial court erred in denying plaintiff's motion to

strike the defense of assumption of risk, and whether the trial court erred in excluding certain evidence offered by the plaintiff and in permitting an argument by the defendant that plaintiff now claims was without support in the record.

## II.

### A. The Assumption of Risk Defense

██ It is well settled that assumption of risk by the plaintiff will bar recovery in a strict liability action which action alleges that the defendant has supplied an unreasonably dangerous product. *See Williams v. Brown Manufacturing Co.*, 45 Ill.2d 418, 261 N.E.2d 305 (1970), citing Restatement (Second) of Torts § 402A, comment n. .Assumption of risk occurs when the user of a product voluntarily and deliberately exposes himself to a danger that is either known to him or is so open and obvious that it must have been comprehended. *See Williams, supra*, 261 N.E.2d at 311; *Ruggeri v. Minnesota Mining & Manufacturing Co.*, 63 Ill.App.3d 525, 20 Ill.Dec. 467, 470, 380 N.E.2d 445, 448 (1978); *Karabatsos v. Spivey Co.*, 49 Ill.App.3d 317, 7 Ill.Dec. 158, 161, 364 N.E.2d 319, 322 (1977); *Ralston v. Illinois Power Co.*, 13 Ill.App.3d 95, 299 N.E.2d 497, 498 (1973). It is, however, an affirmative defense, and the defendant bears the burden of production and persuasion as to each element. *Clark v. Crane Carrier Co.*, 69 Ill.App.3d 514, 26 Ill.Dec. 41, 44, 387 N.E.2d 871, 874 (1979). Further, the cognitive elements of the defense are measured by a subjective rather than an objective standard. The issue in this case is therefore not whether a reasonably prudent person would have appreciated the risk but whether *plaintiff's decedent* knowingly, voluntarily, and deliberately encountered the

hazard. *Sweeney v. Max A. R. Matthews & Co.*, 46 Ill.2d 64, 264 N.E.2d 170 (1970); *Williams, supra*, 261 N.E.2d at 312.

Plaintiff argues that the decedent's subjective apprehension of the risk was not demonstrated by the evidence in this case because there was no testimony that Willeford knew either that the limit switch would not stop the platform at twelve feet or knew that he was in any way encountering a hazard in operating the lift as he did. It was therefore reversible error, reasons the plaintiff, for the trial court to submit the issue of assumption of risk to the jury.[5] We disagree.

██ The fact that a subjective standard is applied to the assumption of risk defense does not mean that the product user's state of mind may be shown only by direct evidence. Such a requirement would in effect grant a near automatic right of recovery in wrongful death actions where often direct evidence could be provided only by testimony from the decedent. Even in non–death actions, where conflicting accounts of the occurrence are in evidence, the trier of fact is not required to base its conclusion on the product user's testimony, but may instead decide the issue on the basis of such circumstantial factors as the user's age, experience, and knowledge. *Sweeney, supra*, 46 Ill.2d at 66, 264 N.E.2d 170. Further, in determining whether the evidence is sufficient to submit the assumption of risk defense to the jury, the trial court should consider the totality of the evidence in the light most favorable to the defendant. *See Williams, supra*, 261 N.E.2d at 312.

██ We think that the record in this case amply supports the trial judge's determina-

---

**5.** There is no issue raised as to the manner in which the trial judge instructed the jury, and indeed, we think that the instruction given, which imposed a heavy burden on the defendants, could not have been objected to by plaintiff. It was, in any event, agreed to by the parties. The instruction was as follows:

The defendants have asserted the affirmative defense that the decedent assumed the risk of injury. To establish that defense, the defendants have the burden of proving:

That the decedent knew at the time of the incident that it was unreasonably dangerous to use the hi-lift maintenance vehicle over 12 feet without the outriggers extended, and that he knew that the 12–foot limit switch was not operating, and that he intentionally raised the hi–lift to approximately 30 feet without extending the outriggers.

tion to submit the issue to the jury. With respect to the issue of whether Willeford knew that it was unreasonably dangerous to operate the lift over twelve feet without the outriggers, the testimony of numerous TWA witnesses is supportive of the fact that plaintiff's decedent had been instructed on the proper method of operating the lift, including the fact that TWA work rules required extension of the outriggers above the twelve foot level.[6] The written warning Nordco provided to TWA was likewise relevant evidence that the jury was entitled to consider.

We note also that the above testimony and documentary evidence, from which the jury could have inferred decedent's awareness of the danger, serves to distinguish this case from those cited by plaintiff. In *Walker v. Trico Manufacturing Co.*, 487 F.2d 595 (7th Cir. 1973), cert. denied, 415 U.S. 978, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974), we held an assumption of risk defense was improperly submitted to the jury when a blow mold machine crushed the hand of its operator after she inadvertently depressed a limit switch while attempting to remove a piece of plastic. The defect alleged was that the manufacturer had failed to place a cover over the switch to prevent just such an accident. The record was, however, devoid of any evidence that the plaintiff in that action was aware of the risk that a momentary brushing of the switch would activate the mechanism.[7] *Scott v. Dreis & Krump Manufacturing Co.*, 26 Ill.App.3d 971, 326 N.E.2d 74 (1975) and *Reese v. Chicago, Burlington & Quincy Railroad Co.*, 55 Ill.2d 356, 303 N.E.2d 382 (1973) likewise involved actions where the record demonstrated that the plaintiff had had no awareness of the danger being encountered.

Regarding the second element of the defense, specifically, that Willeford knew that the switch was not operating, we also agree with the trial judge that the record warranted submission to the jury. While clearly plaintiff's expert and defendants' expert disagreed completely as to the cause of malfunction of the limit switch, the jury was entitled to consider and credit the testimony of defendants' expert, Professor Barnett, to the effect that neither the model of the switch nor the method of installation was responsible for the failure of the switch to stop the platform at twelve feet. The jury was also entitled to credit Professor Barnett's opinion that the switch had not activated because it had been bent by means other than normal operation.

While plaintiff argues that the only evidence in support of this opinion was the presence of scratch marks on the bracket, and that the witness, Mike Wozniak, explained these marks through his description of the repairs he had undertaken on the switch bracket, it is not the province of an appellate court to reweigh evidence or judge the credibility of witnesses.

We are also of the opinion that the undisputed facts of the accident provide at least some circumstantial support for defendants' theory of the accident. The decedent drove directly to the tail of the aircraft, jumped on the platform, and raised it to a height of twenty–eight feet. It is at least arguably unlikely that Willeford, who was in a hurry, would have acted in this manner if he thought that the platform would be halted at twelve feet, requiring him to come down again to extend the outriggers. Moreover, because it takes approximately two minutes and twenty seconds to extend the platform to the height at which the accident occurred, the jury might have concluded that

---

**6.** Plaintiff's brief also argues that defendants' questions regarding the existence of TWA work rules represented an attempt to suggest to the jury that the plaintiff's decedent's contributory negligence barred recovery. Contributory negligence is not, of course, a defense in a strict liability action. We think, however, that defendants properly pursued this line of inquiry as it has some relevance to the issue of Willeford's awareness of the risk. In any

event, plaintiff did not object to the questioning, and first raised the issue near the end of the trial, at which point the court noted plaintiff's failure to object.

**7.** Assumption of risk was also an improper defense for jury consideration in *Walker* because there was no evidence that the plaintiff's act was deliberate.

during that time period Willeford, even if he had initially failed to extend the stabilizers through oversight, was at some point aware of the fact that he was extending the unstabilized platform to a dangerous height. The jury might also have concluded that Willeford, as a competent and experienced lead mechanic, was sufficiently familiar with the equipment used by his crews to have known when he mounted the platform that the switch, whether bent intentionally or otherwise, was not functioning.[8]

Finally, the issue of whether a plaintiff assumed the risk in any given case should generally be decided by the trier of fact, and we think therefore that the trial court acted properly in submitting the issue for determination by the jury.

## B. *The Trial Court's Evidentiary Rulings*

■ The remaining issues raised by plaintiff relate to certain evidentiary rulings of the trial court. Plaintiff first claims that the court erred in refusing to admit for reasons of relevancy evidence of other accidents involving Nordco lifts operating over twelve feet without the stabilizers. We think, however, that the trial court acted properly in excluding this evidence. Nordco consistently maintained that the lift was safe without the outriggers only up to twelve feet, and conceded that it would be unreasonably dangerous above that height unless stabilized. As the district court judge observed, "there is no issue in this case with respect to the dangerousness or unreasonable dangerousness of the product

in question when it is used at a height of 28 to 30 feet without extending the stabilizers. That is not an issue in this case. Defendants concede that." We are likewise not persuaded by plaintiff's contention that the evidence of platform extensions above twelve feet without stabilizers should have been admitted in support of the theory advanced by plaintiff's expert, Irving Hazard, that the normal operation of the vehicle tended to damage the switch mechanism. Plaintiff's offer of proof made no mention of whether a failure of the limit switch was implicated in the other accidents.

Second, and in our view, dispositive, is the fact that plaintiff did not argue this theory of admissibility before the trial court.[9]

■ Plaintiff has also objected on appeal to the trial court's permitting evidence to be entered in the record to the effect that the lift had never blown over in the wind with the outriggers extended. Because plaintiff failed to raise this objection below, however, we decline to review the matter on appeal. *See* Fed.R.Civ.P. 51.

■ The final issue is whether the district court erred in not admitting plaintiff's proffered Exhibit 42, a report from TWA to the FAA on Willeford's death. This, in the trial judge's view was inadmissible hearsay, and was not within the business records exception of Rule 803(6) of the Federal Rules of Evidence because of plaintiff's failure to lay a proper foundation.[10] The letter contained the following observation:

---

8. Plaintiff claims that counsel for Nordco acted improperly in arguing this theory of the accident to the jury and that this "substitution of innuendo for proof" in itself requires a new trial. While we agree with plaintiff that it is impermissible for an attorney to suggest to a jury, either through questioning or argument, facts which are not in evidence and the existence of which are based solely on conjecture, we are of the opinion that the scratch marks on the switch bracket, Professor Barnett's testimony, and the circumstances of the accident provided the necessary evidentiary basis for Nordco's argument.

9. While it is true that at one point one of the attorneys for plaintiff did query as to the admissibility of the evidence under this theory,

before the trial judge could respond, his inquiry was answered in the negative by his co–counsel.

10. The rule provides:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . . .

(6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of

The switch was found operable but the operating arm was slightly bent and would not trigger the safety switch. There is no indication that the arm was bent intentionally. The condition probably resulted from wear, hard usage, or damage.

Plaintiff did not offer the Exhibit until the close of trial and sought to introduce it based on the foundation laid in the deposition of Richard Gooch, senior ground equipment engineer for TWA. The letter had been written by Gooch's supervisor, B. M. Meador, Vice–President of Engineering and Quality Assurance. The court found that the deposition established on its face that the letter was not within the terms of the exception because Gooch, who furnished the information upon which Meador based the letter, was not acting in the ordinary course of business. The court also observed that TWA, although not a party to this litigation, might, through a natural tendency to state facts favorably to itself in a report to the FAA, have omitted the possibility that its crews were bypassing safety mechanisms even on ground equipment, thereby diminishing the trustworthiness of the report.

On appeal, plaintiff strenuously urges that the letter should have been admitted as a report required by law pursuant to Rule 803(8). As this theory was not raised in the district court and no factual basis exists for us to determine the extent of Willeford's contact with the aircraft and hence the question of whether the report was in fact required by law, we do not pass upon this question.

For the reasons stated herein, the judgment of the district court is

Affirmed.

that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.