Roy L. HARRIS and Mildred M. Harris, Plaintiffs-Appellants,

v.

KARRI–ON CAMPERS, INC., an Indiana Corporation; J. C. Duncan, d/b/a Duncan's Romer Sales; Leonard Millslagle, d/b/a Leonard Millslagle's Gulf Service Station; and Donald Martin, Defendants-Appellees.

No. 79–2201.

United States Court of Appeals, Seventh Circuit.

Argued May 28, 1980.

Decided Jan. 27, 1981.

Richard W. Cardot, Elkins, W. Va., for plaintiffs-appellants.

R. Kent Rowe, South Bend, Ind., for defendants-appellees.

Before BAUER, Circuit Judge, KILKENNY, Senior Circuit Judge *, and CUDAHY, Circuit Judge.

BAUER, Circuit Judge.

Plaintiff-appellant Roy L. Harris was severely burned when his camper exploded due to a gas leak. The jury found for defendant-appellee Karri-On Campers, Inc. Appellants charge that the jury was erroneously instructed on various issues. We reverse and remand for a new trial.

* The Honorable John F. Kilkenny, Senior Judge of the United States Court of Appeals for the Ninth Circuit, is sitting by designation.

## I

Roy L. Harris purchased a camper manufactured by Karri-On Campers on July 6, 1975, from Duncan's Romer Sales to live in while at a job site away from home. The camper had a gas-operated stove, refrigerator, and light, but the propane gas system was not hooked up at the time of purchase. J. C. Duncan, the proprietor, told Harris that ordinarily he would fill the tanks for him, but that he had to leave to take care of a family problem. Tr. 102. Harris mounted the camper to his truck and drove to a service station. The station attendant filled the propane tanks and hooked up the regulator, which governed the amount of gas released to the pipes inside the camper. Tr. 33. Harris testified that he saw the station attendant use a crescent wrench to make adjustments, although he was unclear as to how much he saw of the procedure. Tr. 35, 102, 105, 111–112.

Harris then drove to a mobile trailer park. There, he and a friend read the instructions accompanying the unit and lit the pilot lights in the refrigerator, stove, and gas light. Tr. 40–44. Both men smoked while they were in the unit and the windows were open. Tr. 47, 48. Both men testified at trial that they turned off the gas burners after they lit the pilot lights. Tr. 45. After a brief visit in his friend's mobile home, Harris returned to his camper and went to sleep. Tr. 47.

The next morning, Harris stepped down from the sleeping bunk and lit his cigarette lighter. Tr. 49. The first spark ignited an explosion which severely burned Harris and destroyed the camper.

Harris was in a coma for almost two weeks. He spent the next three weeks in the burn unit of the West Penn Hospital in Pittsburgh. Tr. 51, 58. He underwent a painful process of daily whirlpools, skin removal, and bandage replacement. Tr. 52, 55, 56. He remained totally covered by bandages for almost four months. Tr. 61.

Harris recuperated at home for the next eleven months. Mrs. Harris continued the treatments prescribed by the hospital. Tr. 58. He was unable to return to his job as a carpenter for a year.

Harris and his wife filed suit in the Northern District of Indiana against Karri-On Campers, Duncan's Romer Sales, the owner of the service station, and the attendant. All the defendants except Karri-On Campers were dismissed from the case on jurisdictional grounds. The Harrises assert eight errors on appeal. They claim: (1) that the trial judge refused to instruct the jury that comparative fault governed the action; (2) that the court improperly instructed the jury on the definition of a defect; (3) that the court gave insufficient instructions concerning the adequacy of warnings; (4) that there was insufficient evidence to support an instruction on the defense of incurred risk; (5) that there was insufficient evidence to instruct the jury on the defense of misuse; (6) that the court should not have instructed the jury that a manufacturer has no duty to warn of an obvious danger; (7) that the court inadequately instructed the jury on the defendant's burden of proving defenses; and (8) that the court improperly admitted the plaintiffs' complaint into evidence without a corrective or limiting instruction.

## II

As a preliminary matter, we review appellants' motion, taken with the appeal, to certify the issues presented here to the West Virginia Supreme Court of Appeals.[1] We decline to do so.

---

1. Appellants propose that we certify the following questions:

 A. Does West Virginia law apply the doctrine of comparative fault in strict products liability cases and, if so, what is the rule of comparative negligence which applies.

 B. Under West Virginia's application of the rule of strict liability in product cases, does the defense of "incurred risk" apply and; if so,

 1. Was there sufficient evidence in this case to warrant instructing on "incurred risk" and sending the issue to the jury over plaintiff's timely motion for directed verdict?

 C. Under West Virginia's application of the rule of strict liability in product cases, does the defense of "misuse" apply and; if so,

■ West Virginia has enacted the Uniform Certification of Questions of Law Act, W.Va.Code §§ 51–1A–1 to 12. The Act permits a federal court to certify controlling questions of law to the Supreme Court of Appeals of West Virginia when "it appears to the certifying court there is no controlling precedent in the decisions of the supreme court of appeals of" West Virginia. W.Va.Code § 51–1A–1. The power to certify a question is discretionary, and the West Virginia court does not feel itself bound to answer certified questions. *Abrams v. West Virginia Racing Commission*, 263 S.E.2d 103, 105 (W.Va.1980).

In *Morningstar v. Black & Decker Manufacturing Co.*, 253 S.E.2d 666 (W.Va.1979), the Supreme Court of Appeals declared the West Virginia law of products liability. In deciding the issues before us, therefore, we will not be writing on a completely clean slate. Moreover, the request before us is appellants' first such request. Appellants filed and tried the case in federal court without seeking certification. To certify the questions at this late date would only prolong the life of this litigation at all the parties' expense. We therefore decline to certify the questions to the West Virginia Supreme Court of Appeals.

### III

The Harrises first complain that the trial judge failed to instruct the jury that comparative fault governed the findings of liability in their suit. The doctrine of comparative fault permits the plaintiff to recover from a defendant even though his injury was partly the result of his own fault. The doctrine first developed as an alternative to contributory negligence, which completely bars the plaintiff's recovery in a negligence action if he or she is in any way negligent. Applied in a strict liability case, the doc-trine injects the concept of fault into an otherwise "strict" doctrine. *See Daly v. General Motors Corp.*, 20 Cal.3d 725, 144 Cal.Rptr. 380, 575 P.2d 1162, 1166–69 (Cal. 1978).

■ The West Virginia Supreme Court of Appeals has not decided whether comparative fault applies in strict liability cases. We must therefore decide "what rule the [West Virginia] Supreme Court would adopt in such a case and apply it." *Huff v. White Motor Corp.*, 565 F.2d 104, 106 (7th Cir. 1977), *vacated and remanded on other grounds*, 609 F.2d 286 (7th Cir. 1979). Our decision must not be based on our own views of what the law should be; rather, we must analyze West Virginia decisions to see the approach taken by its courts. We must consider all the data which the West Virginia court would consider. *Huff v. White Motor Corp.*, 565 F.2d at 106.

The West Virginia Supreme Court of Appeals has said that although it is not a leader, it has not "languished in the rear" of the products liability movement. *Morningstar*, 253 S.E.2d at 680. In *Morningstar*, the West Virginia court adopted strict liability in tort for defective products. In so doing, the court analyzed Section 402A of the Restatement (Second) of Torts (1965) and the standards of strict liability enunciated in various states. Although using the laws of all the states for reference, the court viewed the chief conflict as between the California rule in *Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 27 Cal. Rptr. 697, 377 P.2d 897 (Cal.1962), and the Restatement rule.

The court reviewed the Restatement position and observed that the Restatement defined a defective product in terms of whether it is "unreasonably dangerous".[2]

---

1. Was there sufficient evidence in this case to warrant instructing on "misuse" and sending the issue to the jury over plaintiff's timely motion for directed verdict?
Appellants' Request To Certify Question at 1.

**2.** The Restatement (Second) of Torts § 402A provides in part:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property . . . .

The court rejected this standard because it placed

a concept of foreseeability into the tort product liability law which is inappropriate, since the manufacturer's liability is not based on negligence and the issue of foreseeability is a part of negligence law.

253 S.E.2d at 680.

After rejecting the Restatement position, the court considered an appropriate definition of "defect." It analyzed the rules in California, Illinois, and New Jersey in reaching its conclusion. The court concluded that both California and Illinois required that the plaintiff "show he was using the product in a normal manner and was injured" to prove a defect. *Id.* at 681. The court ultimately rejected the Illinois test, however, because Illinois adopted the "unreasonably dangerous" standard of the Restatement for strict liability. The court also refused to apply the recent California definition of defect, announced in *Barker v. Lull Engineering Co., Inc.*, 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443 (Cal.1978). That case held that a defect in design is proved

(1) if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) if the plaintiff proves that the product's design proximately caused his injury and the defendant fails to prove, in light of the relevant

factors discussed above, that on balance the benefits of the challenged design outweigh the risk of danger inherent in such design.

*Id.* 143 Cal.Rptr. at 239–40, 573 P.2d at 457–58. The second part of the definition involved a "risk/utility" analysis similar to the New Jersey test.[3] While the *Morningstar* court agreed that "a risk/utility analysis does have a place in a torts product liability case by setting the general contours of relevant expert testimony," 253 S.E.2d at 682, the court rejected the doctrine's use as a jury standard. Instead, the court held, "what is a defective product must be analyzed in traditional tort terminology." *Id.* Since *Greenman* did not define "defect," the court drew on precedent from the states discussed above in articulating what it believed to be a reasonable interpretation of the general *Greenman* standard. The court concluded that the general test of a defective product "is whether the involved product is defective in the sense that it is not reasonably safe for its intended use." *Id.* at 683. The test, the court noted, was in accord with *Greenman*, although it was "somewhat more restrictive" than *Morningstar* at 684.

It thus appears that the West Virginia court has adopted a more "conservative" approach to strict liability than California. Although generally following that state's lead, the court is reluctant to adopt the latest pronouncement from California. In-

---

Comment g defines defective condition as one which is "unreasonably dangerous" "at the time it leaves the seller's hands." Comment i defines "unreasonably dangerous" as "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."

**3.** *Cepeda v. Cumberland Engineering Co., Inc.*, 76 N.J. 152, 386 A.2d 816 (1978). The factors to be considered in the risk/utility analysis are:

(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

(2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

*Id.* 386 A.2d at 826–27.

stead, the court follows the original *Greenman* approach, as it has been interpreted by other states.

The California Supreme Court adopted comparative negligence in negligence cases in 1975. *Li v. Yellow Cab Co.*, 13 Cal.3d 804, 119 Cal.Rptr. 858, 532 P.2d 1226 (Cal. 1975). *Li* pronounced a rule of "pure" comparative negligence which permits the plaintiff to recover regardless of the amount of his negligence so long as the defendant's negligence proximately caused the injury. The California court extended the doctrine to strict liability cases in *Daly v. General Motors Corp.*, 20 Cal.3d 725, 144 Cal.Rptr. 380, 575 P.2d 1162 (Cal.1978). Both these cases abolished the defenses of assumption of the risk, misuse, and last clear chance, and replaced them with a system of assessing liability in proportion to each party's fault. *Li*, 119 Cal.Rptr. at 872, 532 P.2d at 1240–41; *Daly*, 144 Cal.Rptr. at 390–391, 575 P.2d at 1172–73.

The West Virginia court adopted the doctrine of comparative negligence in negligence cases in *Bradley v. Appalachian Power Co.*, 256 S.E.2d 879 (W.Va.1979). While believing the rule prohibiting recovery for slight contributory negligence to be unfair, the court also rejected the "pure" comparative negligence of *Li*. The court ruled that "pure" comparative negligence was inequitable because it allowed a plaintiff with great fault and large damages to impose liability on a defendant who was not substantially negligent. *Id.* at 883. Moreover, the "singular emphasis on the amount of damages" of the pure comparative negligence approach made liability depend on the parties' insurance. *Id.* at 885.

The court reasoned that the policy of fair apportionment of damages required that a plaintiff's recovery be reduced by his contribution to his injury. On the other hand, the court stated it was "not willing to abandon the concept that where a party substantially contributes to his own damages, he should not be permitted to recover for any part of them." *Id.*

In accordance with these policies, the court adopted a "substantially negligent"

standard, stating that it was "an intermediate position" between the current West Virginia rule and the California rule. *Id.* at 887. The court held that

a party is not barred from recovering damages in a tort action so long as his negligence or fault does not equal or exceed the combined negligence or fault of the other parties involved in the accident.

*Id.* at 885.

Appellants argue that the West Virginia court would apply *Bradley* to strict liability cases. We disagree. Comparative fault requires abolition of the defenses of assumption of risk and misuse. *See Daly*, 144 Cal.Rptr. at 390, 575 P.2d at 1172. *Morningstar*, however, expressly held that assumption of risk and misuse are available defenses in strict liability actions. *Morningstar*, 253 S.E.2d at 683–84. The court did not adopt these defenses in a decisional vacuum. *Daly* was decided in 1978, *Morningstar* in 1979. Had the West Virginia court wished to adopt comparative fault in strict liability cases, it certainly could have done so. Instead, it followed a more middle-of-the-road approach, followed by many states, of permitting certain defenses that bar recovery in strict liability cases. *See Morningstar*, 253 S.E.2d at 683–84 (and cases cited).

■ The systems of liability outlined in *Morningstar* and *Bradley* do not produce inconsistent results. *Bradley* modified the West Virginia rule of contributory negligence, which barred recovery for even slight negligence. *Morningstar* was in accord with the policy expressed in *Bradley*. *Morningstar* disallows contributory negligence in strict liability actions when it consists " 'merely in a failure to discover the defect in the product, or to guard against the possibility of its existence.' " *Morningstar*, 253 S.E.2d at 683, *quoting Restatement (Second) of Torts* § 402A, Comment n (1965). Thus, slight contributory fault will not bar recovery in either negligence or strict liability cases. On the other hand, substantial fault by the plaintiff in negligence cases, or assumption of risk or misuse in strict liability cases, will bar all recovery.

One West Virginia commentator has argued that the state will adopt comparative fault. He criticized the doctrine's introduction in strict liability actions as bringing negligence back into a system that rejects fault as a basis of liability. Rowe, *Applying Strict Liability to Defective Products Litigation in West Virginia with Explanatory Emphasis Upon Coal Mining Machinery Cases*, 82 W.Va.L.Rev. 13, 25 (1979–80) (footnote omitted). He nevertheless concluded that West Virginia would blindly follow California law. As we have said, however, the West Virginia court is no mere follower. Were it confronted with the issue, the West Virginia court would analyze, as we have, its precedent and arrive at a conclusion consistent with the policies expressed in its opinions.

Our review convinces us that West Virginia would not embrace comparative fault in strict liability cases. The trial court was therefore correct in refusing appellants' proposed instructions.

## IV

■ Our preceding discussion of West Virginia law makes clear that the jury was erroneously instructed on the standard of strict liability to be applied in this case. The jury was instructed that

Under the doctrine of strict liability, one who sells a product in a defective condition, *unreasonably dangerous* to the user is subject to liability for physical harm thereby caused to the user, if:

1. The seller is engaged in the business of selling such product; and

2. It is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

The rule also applies even though:

a. The seller has exercised all possible care in the preparation and sale of his product; and

b. The user or consumer has not bought the product from or entered into any contractual relation with the seller.

The jury was further instructed that

Defective condition is a condition not contemplated by the ultimate user which will be *unreasonably dangerous* to him; that is, more dangerous than that which would be contemplated by the ordinary user of such products with the ordinary knowledge common to such users as to its characteristics, its proper uses, and the proper manner of its use.

(Emphasis added.)

As we have already stated, *supra* Part III, West Virginia has rejected the Restatement definition that a defective product is one that is "unreasonably dangerous." *Morningstar*, 253 S.E.2d at 680–84; *see also* Rowe, *supra*, at 16–17. Indiana had adopted that definition as its standard in defective products cases. *Ayr-Way Stores, Inc. v. Chitwood*, 300 N.E.2d 335 (Ind.1973). However, the law of West Virginia, not Indiana, governed this lawsuit, and it was reversible error not to instruct the jury in West Virginia law. *Brandes v. Burbank*, 613 F.2d 658 (7th Cir. 1980); *Hansen v. Cessna Aircraft Co.*, 578 F.2d 679, 682 n.3 (7th Cir. 1978).[4]

A more appropriate instruction would have drawn on *Morningstar* and *Greenman v. Yuba Power Products, Inc.*, upon which *Morningstar* was based. *Greenman* stated that

[i]mplicit in the [product's] presence on the market . . . was a representation that it would safely do the jobs for which it was built . . . . To establish the manufacturer's liability it was sufficient that plaintiff proved that he was injured while using the [product] in a way it was intended to be used as a result of a defect in design and manufacture of which

**4.** Both the appellee's and appellants' tendered instructions depended on the "unreasonably dangerous" definition of the Restatement (Second) § 402A. Appellants did not specifically object to this instruction on the ground discussed here. That "is of no practical signifi-

cance, because a new trial is required for another reason, and in the new trial plaintiffs will be entitled to a proper instruction on this aspect of the case." *Goodman v. Epstein*, 582 F.2d 388, 409 (7th Cir. 1978), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979).

plaintiff was not aware that made the [product] unsafe for its intended use. *Greenman*, 27 Cal.Rptr. at 701, 377 P.2d at 901. *Morningstar* further defined a defective product as one whose physical condition, as a result of design or manufacture, "renders it unsafe when the product is used in a reasonably intended manner." 253 S.E.2d at 682. The court further held that "unsafe"

> imparts a standard that the product is to be tested by what the reasonably prudent manufacturer would accomplish in regard to the safety of the product, having in mind the general state of the art of the manufacturing process, including design, labels and warnings, as it relates to economic costs, at the time the product was made.

*Id.* at 682–83. The court concluded:

> the general test for establishing strict liability in tort is whether the involved product is defective in the sense that it is not reasonably safe for its intended use. The standard of reasonable safeness is determined not by the particular manufacturer, but by what a reasonably prudent manufacturer's standards should have been at the time the product was made.

*Id.* (footnote omitted). These are the standards by which the trial court should frame an appropriate instruction at the new trial. The court should be careful to omit any reference to unreasonable dangerousness because West Virginia has rejected that language as a standard. *Morningstar*, 253 S.E.2d at 680.

Appellants further complain that the strict liability instruction was incorrect because the trial court failed to instruct the jury that Harris had no duty to discover the defect, as held in *Morningstar*, 253 S.E.2d at 683. Plaintiffs' tendered instruction 4 was

adequately covered by court's instruction 43.[5] While the plaintiffs' tendered instruction was clearer and simpler, it was not error for the court to give its instruction. *Brandes v. Burbank*, 613 F.2d at 669; *Goodman v. Epstein*, 582 F.2d 388, 404 (7th Cir. 1978), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979).

## V

Appellants' alternative theory of the case rested on proof that the camper was defective for failure to warn of the gas line system's dangers. Appellants contend that the trial court erred in refusing to give its tendered instruction on the adequacy of warnings.

The evidence on warnings here centered around a notice on the camper door. The notice said:

> This gas piping system is designed for the use of liquefied petroleum gas only. Do not connect natural gas to this system. Securely cap inlet when not connected for use. After turning on gas, except after normal container replacement, test gas piping and connections to appliance for leakage with soapy water or bubble solution. Do not use products that contain ammonia or chlorine.

Tr. 141–43.

Harris testified that he could not recall whether he saw or read the label on the camper door. Tr. 113, 115. He further testified that he thought the instruction to check the gas line system did not apply to the initial hookup of the system. Tr. 143. Defense witness Irving agreed. Tr. 305–06. Harris also testified that he did not know the camper had to be inspected for gas leaks. Tr. 119. It was up to the jury to decide whether the notice was a warning and whether it was adequate.

---

5. Court's Instruction 43 stated:

Ladies and gentlemen of the jury, contributory negligence is defined as a failure of the plaintiff to use reasonable care to avoid injury to himself which failure is the proximate cause of the injuries for which he seeks to recover. This is an action based upon strict liability and you are instructed that under the

law contributory negligence on the part of the plaintiff cannot be raised as a defense and cannot be considered by you.

Plaintiffs' tendered instruction 4 stated:

The failure of the user to discover a defect, or to guard against the possibility of a defect, is not a defense to strict liability.

Other evidence at trial concerned the installation of the tanks and adjustment of the regulator. Harris saw the service station attendant install the tanks, and Harris testified that he saw the attendant use a crescent wrench. Tr. 119. Karri-On presented evidence that the attendant should have used two wrenches, and that the use of only one wrench might twist the pipes and rupture them. Tr. 314–16.

The Harrises reply that if there was a danger of twisting the pipes, it was foreseeable by Karri-On, and it should have put warnings to that effect on the camper. The Harrises also assert that proper instructions for the installation of the tanks and adjustment of the regulator should have been included. It was thus up to the jury to determine also whether the danger of twisting the pipes was foreseeable and whether Karri-On had a duty to warn or instruct.

The jury was instructed:

Sometimes a product cannot be made reasonably safe, but it is nevertheless desirable that the product be manufactured and distributed because of its utility. In such cases, it is the obligation of the manufacturer to give appropriate warning of any dangerous condition which is likely to be encountered. Failure to fulfill that duty is a defect in the product.

Appellants tendered an instruction that contained much of the above language, but also said

It is not any warning or instruction that is sufficient to relieve a manufacturer of its responsibility to the ultimate user of the machine. The warning or instruction must be provided or displayed in such a way that it will be seen by the user. It must also be legally sufficient; that is, it must warn of the danger in clear language so that the user will know what the hazard or danger is. A vague or ambiguous warning or instruction is not legally sufficient.

The trial court refused the instruction, stating that the substance of the instruction was already covered by the court's instructions. Tr. 415. We disagree.

*Morningstar* held that a product may be defective because of "the lack of, or the inadequacy of, warnings, instructions and labels" even if the product is not in a flawed physical condition. 253 S.E.2d at 682. *Morningstar* thus anticipated that the adequacy of warnings given may be a jury issue. *See also Fabian v. E. W. Bliss Co.*, 582 F.2d 1257, 1263 (10th Cir. 1978); *Johnson v. Husky Industries, Inc.*, 536 F.2d 645, 648 (6th Cir. 1976).

█ The jury was not told of its responsibility to judge the adequacy of the label as a warning. A manufacturer's duty is to give a warning which is adequate and sufficient to warn of the danger. *See DeSantis v. Parker Feeders, Inc.*, 547 F.2d 357, 363 n.6 (7th Cir. 1976); *American Optical Co. v. Weidenhamer*, 404 N.E.2d 606, 614–19 (Ind. App.1980). Since the evidence was sufficient to raise a conflict as to the adequacy of warnings, the jury should have been instructed on the issue.

## VI

█ The jury was instructed

The plaintiff may not recover in this action, even though you may find that the defendant's product was defective and unreasonably dangerous, if you find for the defendant on the issue of whether the plaintiff incurred or assumed the risk of his injury. The burden of proving this issue, by a fair preponderance of the evidence, is upon the defendant.

The Harrises contend that there was insufficient evidence to instruct the jury on assumption of risk. We agree.

*Morningstar* held that

the defense of assumption of risk is available against the plaintiff, where it is shown that with full appreciation of the defective condition he continues to use the product. The hallmark of this defense is actual knowledge on the part of the plaintiff.

253 S.E.2d at 683.[6] There was no evidence at trial that Roy Harris had any knowledge whatsoever of a defect in the camper.

Karri-On asserts that Harris assumed the risk because he knew the gas system had not been checked and yet "did absolutely nothing about it." Brief for Appellee at 32. As we have said, however, *supra* Part IV, failure to discover a defect is not a defense to strict liability. Rather, assumption of risk requires actual knowledge of an admittedly defective condition. *Morningstar*, 253 S.E.2d at 683–84. For example, in *Williams v. Brown Manufacturing Co.*, 45 Ill.2d 418, 261 N.E.2d 305, 309–12 (1970), relied on by *Morningstar*, 253 S.E.2d at 683–84, there was evidence that the plaintiff was aware that he was using a trencher in an unusual fashion and that the trencher might jolt backwards if something got caught in the drive belt. The plaintiff had also read cautionary instructions relating to the use of the drive belt.

We found the evidence of assumption of risk sufficient in *Campbell v. Nordco Products*, 629 F.2d 1258 (7th Cir. 1980). There the decedent had received training in the use of a forklift, and was specifically warned that it was dangerous to lift the platform above twelve feet without extending safety outriggers. *Williams* and *Campbell* were based on Illinois law. The Illinois and West Virginia standards for assumption of risk are the same. *Campbell v. Nordco Products*, 629 F.2d at 1262.[7]

Appellants concede that Harris did not have to be "aware of the specific causes of the defect to raise the issue of incurred risk." Appellants' Reply Brief at 4. General knowledge of the volatile nature of

propane gas, however, is not enough because that is not the defect that caused Harris' injury. In *Reese v. Chicago, Burlington & Quincy Railroad Co.*, 55 Ill.2d 356, 303 N.E.2d 382, 384 (Ill.1973), the defendant claimed that the plaintiff assumed the risk when he stood under a 1,200 pound bucket suspended from a crane while hoisting was underway. The court held that general knowledge of the danger of standing under heavy objects was insufficient to raise the defense of assumption of risk. The court held:

> Since Koehring is unable to demonstrate that Reese was aware of any dangerous or defective condition of the crane, it is clear that these actions do not constitute an assumption of risk. Without more, they raise only the possibility of simple contributory negligence, not a defense in a products liability action.

*Id.*, 303 N.E.2d at 385 (citation omitted).

The evidence elicited at trial showed only that Harris knew of the explosive properties of propane gas and of the general dangers of gas leaks. Karri-On did not demonstrate that Harris actually knew that the gas piping system was defective or that there was a gas leak.

Appellee argues that Harris assumed the risk when he disregarded the warning on the camper. While disregard of warnings may be a part of assumption of risk, there must still be evidence that the victim subjectively knew of the defect and its dangers. *Walker v. Trico Manufacturing Co., Inc.*, 487 F.2d 595, 599 (7th Cir. 1973), *cert. denied*, 415 U.S. 978, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974).

---

6. Earlier West Virginia cases held that the core of assumption of risk was "venturousness." *Spurlin v. Nardo*, 114 S.E.2d 913, 919 (1960). That decision emphasized the difference between failure to exercise due care and assumption of the risk, stating, "[k]nowledge and appreciation of the danger are necessary elements of the defense of assumption of risk." *Id.* at 920.

7. We note that West Virginia did not adopt the Indiana definition of incurred risk detailed in *Gilbert v. Stone City Construction Co., Inc.*, 357 N.E.2d 738, 746 (Ind.App.1976), and *Cornette v.*

*Searjeant Metal Products, Inc.*, 147 Ind.App. 46, 258 N.E.2d 652 (1970). Those cases hold that " 'one incurs all the ordinary and usual risks of an act upon which he voluntarily enters, so long as those risks are known and understood by him, or could be readily discernable by a reasonable and prudent man under like or similar circumstances.' " *Id.* at 657, quoting *Stallings v. Dick*, 139 Ind.App. 118, 210 N.E.2d 82, 88 (1966). *Morningstar* expressly rejected an "objective" approach to assumption of risk. Defendant's reliance on the Indiana cases is therefore inappropriate.

The trial court should consider the totality of the evidence in the light most favorable to the defendant in determining whether the evidence is sufficient to submit the assumption of risk defense to the jury. *Campbell v. Nordco Products*, 629 F.2d at 1262. Since defendant presented no evidence to raise the issue, it was not entitled to a jury instruction on incurred risk. *Brandes v. Burbank*, 613 F.2d at 668; *Beard v. Mitchell*, 604 F.2d 485, 497 (7th Cir. 1979).

## VII

■ The Harrises next contend that the jury should not have been instructed on the defense of misuse. The court's instruction said:

> You are instructed that misuse is the use of a product different from that contemplated to be safe by an ordinary user or more strenuous than that contemplated to be safe by an ordinary user.
>
> Accordingly, if you find from the evidence in this case that the plaintiff misused the product in question, then he cannot recover against the defendants in this case.

The plaintiffs again assert that there was insufficient evidence of misuse to submit the question to the jury. Karri-On argues that the same evidence supported both the incurred risk and misuse instructions. It also asserts that Harris misused the camper by ignoring warnings. Finally, Karri-On argues that there was evidence that the service station attendant or the dealer misused the camper.

Our inquiry, however, is limited to whether there was any evidence that Harris misused the camper. First, misuse by third parties may not be considered as a defense here. While the actions of third parties may properly be considered as an intervening cause and the jury was so instructed,[8] the above instruction indicates that only the plaintiff's misuse would bar recovery. Second, although disregard of warnings may be considered misuse, *see* Prosser, Torts § 102, at 669 (4th ed. 1971), disregard of warnings was covered by another instruction and was not made part of the misuse instruction.[9]

*Morningstar* adopted the defense of "abnormal use" and defined it as a "counterpart" of the "issue of appropriate use of the product." 253 S.E.2d at 683. The court defined the intended use of a product as "all those uses a reasonably prudent person might make of the product, having in mind its characteristics, warnings and labels." 253 S.E.2d at 683. *Morningstar* relied on Dean Prosser's explanation of abnormal use, which is mishandling or using the product in some unusual and unforeseeable way. 253 S.E.2d at 683; Prosser, Torts § 102, at 668–69. There is no evidence whatsoever that Harris used the camper in an imprudent way, or in a way different from or more strenuous than that contemplated to be safe by an ordinary user. Instruction 39 therefore should not have been given. *Beard v. Mitchell*, 604 F.2d at 497; *Campbell v. Nordco Products*, 629 F.2d at 1262.

8. The jury was instructed:
 A prior and remote cause is not the proximate cause of an injury if such prior cause did nothing more than furnish the condition or give rise to the occasion by which the injury was made possible, if there intervened between such prior or remote cause and the injury an active, direct, independent, effective, and efficient cause of the injury. Thus, if you find that the conduct of the defendant, in designing and producing its product, did nothing more than furnish a condition by which the plaintiff's injury was made possible, and that there intervened between defendant's conduct and the injury an act or omission of a third party which was the direct, independent, and effective cause of the injury, then the defendant's product may not be a proximate cause of the injury.

9. The jury was instructed:
 The defendant, Karri-On Campers, Inc., had the right to assume that the truck-camper unit manufactured and sold by it would be put to a normal use for the purpose for which it was intended and in accordance with directions and warnings properly given. The defendant, Karri-On Campers, Inc., is not liable under the theory of strict liability if the injuries sustained by the plaintiffs resulted from the failure of the plaintiff, Roy L. Harris, to heed warnings or directions properly given.

## VIII

█ The "obvious danger" instruction was given over plaintiffs' objection. Instruction 33 stated:

You are instructed that a manufacturer has no duty to warn its customers of a danger that is generally known and recognized. If the ordinary consumer would realize a danger through knowledge common to members of the community, then the manufacturer is not required to issue a warning of danger.

The obvious danger doctrine is seldom used and has been criticized. *See* Comment, *Indiana's Obvious Danger Rule for Products Liability*, 12 Ind.L.Rev. 397 (1979). The leading case is *Burton v. L. O. Smith Foundry Products Co.*, 529 F.2d 108 (7th Cir. 1976), which construed Indiana law. *Burton* explained that the "obvious danger" doctrine is a modification of the requirement that a seller's product not be "unreasonably dangerous." Since a product may be considered safe if there are adequate warnings, it was thought that some products with "obvious" dangers, such as a knife, needed no warning. *Id.* at 110–11.

West Virginia, however, has rejected the unreasonably dangerous definition of defective product; rather, a product unsafe for its intended use is defective in West Virginia. *Morningstar*, 253 S.E.2d at 683. Indeed, *Morningstar* appears to have expressly rejected the obvious danger doctrine. It critized the "unreasonably dangerous" test because it would bar the plaintiff's recovery "if there is an obvious defect in the product under the foreseeability concept." *Id.* at 680, *criticizing Restatement (Second) of Torts* § 402A, Comment i. Since a knife, for example, is safe for its intended use, no warnings are required. The obvious danger doctrine, therefore, has no applicability in West Virginia and Instruction 33 should not have been given.

Even if permissible, there was no evidence to support the instruction under the facts of this case. Karri-On asserts the instruction was proper because

the danger of explosion associated with [liquid propane] gas given its propensity to ignite is well known and Karri-On was not required to issue a warning advising the consumer or user against lighting a match if a gas leak were present.

Brief for Appellee at 40. Karri-On also argues that they had no duty to warn of a gas leak because Harris admitted that he knew that a gas leak could be dangerous. *Id.* The explosive nature of propane gas, however, was not the danger about which Karri-On had a duty to warn. The gas line system of the camper, not the gas, is the defective product. The danger of a gas line leak is not an "obvious" one; it is indeed the very sort of danger against which a manufacturer has a duty to guard or warn. It was therefore error to instruct the jury on the obvious danger doctrine here.

## IX

Appellants' last two contentions require little discussion. The court adequately instructed the jury that the burden of proving defenses was on the defendant in instructions 21, 22, 38 and 39.[10] It was not required to do more.

█ Finally, the court did not err in admitting appellants' complaint without a limiting instruction. While the better practice might have been to refuse to admit it into evidence, *see Douglas Equipment, Inc. v. Mack Trucks, Inc.*, 471 F.2d 222, 224–25 (7th Cir. 1972), it was within the court's discretion to admit it.

## X

The errors committed in the trial below require a remand for a new trial. In sum we hold: (1) that the doctrine of comparative fault does not govern an action under West Virginia strict liability law; (2) that the instruction governing the definition of a defective product was erroneous; (3) that the jury should have been instructed to consider the adequacy of the camper's label as a warning; (4) that there was insuffi-

---

10. Of course, instructions 38 and 39 would be omitted in the next trial, since the defenses of misuse and incurred risk are now out of the case.

cient evidence to justify instructing the jury on the defenses of assumption of risk and misuse; and (5) that it was error to give the "obvious danger" instruction. We also hold that the trial court acted within its discretion in framing its instruction on the burden of proving defenses and in admitting the plaintiffs' complaint into evidence without a limiting instruction. We reverse and remand for a new trial in accordance with this opinion.

Reversed and Remanded.